

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Orville S. Carpenter
Chairman and Executive Director
Texas Unemployment Compensation Commission
Austin, Texas

Dear Sir:

Opinion No. O-1524
Re: Constitutionality of H. B. 759,
Acts, Regular Session, 46th
Legislature, authorizing and
directing the transfer of an
estimated $4,000,000.00 from
the Unemployment Trust Fund to
the Railroad Unemployment In-
surance Account, and the auth-
ority of the Texas Unemployment
Compensation Commission to
effect such transfer in accord-
ance with the terms of said
Act.

By your request of July 5, 1939, and your letter of
October 2, 1939, in renewal of such request, you submit for the
opinion of this Department the following inquiry, which we quote
from your first letter:

"Reference is made to an Act of Congress cited as the
Railroad Unemployment Insurance Act and approved by the
President June 25, 1938. Your attention is directed to
Section 13 of this Act which relates to the transfer of
money from a State Unemployment Trust Fund to the Railroad
Unemployment Insurance Account.

"This Act establishes under the administration of the
Railroad Retirement Board a Federal system of unemployment
insurance for railroad workers, and Section 13 thereof
requires the States to so amend their State unemployment
compensation laws that July 1, 1939, railroads and rail-
road workers shall be exempted from the provisions of
State Unemployment Insurance Laws. Provision is made for
the transfer out of the State Unemployment Trust Fund to
the Railroad Unemployment Insurance Account of a sum of
money that is estimated to be the amounts collected in

Hon. Orville S. Carpenter, Page 2

unemployment taxes from railroads less the amounts paid out in benefits to railroad workers as of June 30, 1939. The determination of this amount is made a responsibility of the Social Security Board after agreement with the Railroad Retirement Board and consultation with the State. The penalty provided for the States that do not so amend their laws is contained in subsection (d) of Section 13 and is a withholding of grants for administrative expense of the State unemployment compensation law.

"Accordingly, the Texas Unemployment Compensation Act was amended at the recent session of the Texas Legislature by House Bill 759, and this amendment is now Section 9(A) of the Texas Act.

"Under the terms of this amendment it becomes necessary for the Texas Unemployment Compensation Commission within thirty days after the close of the regular session of the Legislature to authorize and direct the Secretary of the Treasury to transfer from the Texas Unemployment Compensation Fund to the Railroad Unemployment Insurance Account an amount of money known as the "preliminary amount." For your information, it is estimated that this amount will approximate $4,000,000.00.

"So far as we know, the validity or constitutionality of the Railroad Unemployment Insurance Act has never been passed upon by the courts of the United States; likewise, the validity or constitutionality of House Bill 759 amending the Texas Unemployment Compensation Act has not been passed upon by the courts of this State, and this Commission is reluctant to authorize and direct the transfer of such a large sum of money in the absence of such determinations.

"Will you, therefore, inform us as to whether in your opinion the Commission is obliged at this time to authorize and direct this transfer, and, if so, what liability may be incurred by our so doing in the event either of these Acts may later be held to be unconstitutional."

A proper determination of the question presented requires a consideration of two Federal statutes and two State statutes, viz., 42 U.S.C.A., Title 3, Sections 301-303, and Titles 7, 8 and 9, Sections 901-1110, constituting a part of the Federal Social Security Act; 45 U.S.C.A., Sections 351-366, hereinafter cited as the Railroad Unemployment Insurance Act; Articles 5521b-1 to 5521b-23, Vernon's Annotated Civil Statutes of Texas, hereinafter referred

Hon. Orville S. Carpenter, Page 3

to as the Texas Unemployment Compensation Act; and House Bill 759, Acts, Regular Session, 46th Legislature, amendatory of the Texas Unemployment Compensation Act, and being Articles 5521b-1a, 5521b-7a, and 5521b-9a of said Act.

Your request seeks our opinion upon the validity and constitutionality of the Railroad Unemployment Insurance Act and House Bill 759, Acts, Regular Session, 46th Legislature. This Department will not presume to pass judgment upon the constitutionality of an act of Congress, but will properly limit its opinion to the validity or constitutionality of the Act of the Texas Legislature cited. Consequently, for purposes of this opinion, the provisions of the Federal Social Security Act and the Railroad Unemployment Insurance Act, pertinent to the instant inquiry, will be assumed to be in all things constitutional. In passing, however, it might be stated that the Federal Social Security Act was, by a divided Supreme Court, held to be constitutional in the case of Chas. Steward Machine Co. vs. Davis, 301 U. S. 548, 57 Sup. Ct. 883.

Due to the inter-relations of the Acts of Congress and of the Texas Legislature, hereinabove cited, regarding the cooperative social security program between the Federal and State governments, a brief review at the outset, with reference to the pertinent provisions of such acts would not be amiss. The provisions which we deem pertinent are those involving the creation and maintenance of the Unemployment Compensation Fund and Unemployment Compensation Administration Fund in the State Treasury, the Unemployment Trust Fund in the Federal Treasury, and the Railroad Unemployment Insurance Account in said latter fund.

On August 14, 1935, the Federal Social Security Act became effective, and pursuant thereto as reflected in the emergency clause, Senate Bill No. 5, Acts, 3rd Called Session, 44th Legislature, became effective October 27, 1936, to provide for the Texas Unemployment Compensation system. The Federal Act imposes an annual excise tax upon employers of eight or more with respect to having individuals in their employ, and an income tax upon their employees, both based upon a certain graduated percentage of the payroll, which tax is paid into the Treasury of the United States as other internal revenue collections. As an inducement to the various states of the Union to enact similar unemployment compensation measures and for the protection of such states from unfavorable business conditions, compared to states which did not have such legislation, the Federal Act provides that an employer may credit against this federal tax, but not to exceed ninety per cent thereof, the amount of contributions made by him under a state unemployment compensation law, which has been certified by the Federal Social Security Board as having certain prescribed provisions. One of these is that all moneys received

Hon. Orville S. Carpenter, Page 4

into the State's unemployment fund shall immediately be paid over to the Secretary of the Treasury to the credit of the Unemployment Trust Fund.

For the purpose of providing "benefits" to the unemployed of Texas coming within the purview of the Texas Unemployment Compensation Act, said Act requires certain employers of Texas to make annual payments or "contributions" measured by a graduated percentage of the payroll, and there "contributions" are paid into the Unemployment Compensation Fund in the State Treasury, which is established and controlled by Article 5221b-7, as amended, in the following manner:

"(a) Establishment and Control: There is hereby established as a special fund, separate and apart from all public moneys or funds of this State, an Unemployment Compensation Fund, which shall be administered by the Commission exclusively for the purposes of this Act. This fund shall consist of (1) all contributions collected under this Act, together with any interest thereon collected pursuant to Section 14 of this Act; (2) all fines and penalties collected pursuant to the provisions of this Act; (3) interest earned upon any moneys in the fund; (4) any property or securities acquired through the use of moneys belonging to the fund; and (5) all earnings of such property or securities. All moneys in the fund shall be mingled and undivided.

"(b) Accounts and Deposit: The State Treasurer shall be treasurer and custodian of the fund who shall administer such fund in accordance with the directions of the Commission and the Comptroller shall issue warrants upon it in accordance with such regulations as the Commission shall prescribe. The Treasurer shall maintain within the fund three (3) separate accounts: (1) a clearing account, (2) an unemployment trust fund account, and (3) a benefit account. All moneys payable to the fund, upon receipt thereof by the Commission, shall be forwarded to the Treasurer who shall immediately deposit them in the clearing account. Refunds payable pursuant to Section 14 of this Act may be paid from the clearing account upon warrants issued by the Comptroller under the direction of the Commission. After clearance thereof, all other moneys in the clearing account shall be immediately deposited with the Secretary of the Treasury of the United States of America to the credit of the account of this State in the Unemployment Trust Fund, established and maintained pursuant to Section 904 of the Social Security Act, as

Hon. Orville S. Carpenter, Page 5

amended, any provisions of law in this State relating to the deposit, administration, release, or disbursement of moneys in the possession or custody of this State to the contrary notwithstanding. The benefit account shall consist of all moneys requisitioned from this State's account in the Unemployment Trust Fund. Moneys in the clearing and benefit accounts may be deposited by the Treasurer, under the direction of the Commission, in any bank or public depository in which general funds of the State may be deposited, but no public deposit insurance charge or premium shall be paid out of the fund. . . ."

The Unemployment Trust Fund established in the Treasury of the United States by Section 904 of the Social Security Act, and referred to in the foregoing statute, is constituted as follows:

"(a) There is hereby established in the Treasury of the United States a trust fund to be known as the 'unemployment trust fund', hereinafter in this chapter called the 'fund'. The secretary of the Treasury is authorized and directed to receive and hold in the fund all moneys deposited therein by a State agency from a State unemployment fund, or by the Railroad Retirement Board to the credit of the railroad unemployment insurance account. Such deposit may be made directly with the Secretary of the Treasury or with any Federal Reserve bank or member bank of the Federal Reserve System designated by him for such purpose.

"(b) It shall be the duty of the Secretary of the Treasury to invest such portion of the Fund as is not, in his judgment, required to meet current withdrawals. Such investment may be made only in interest bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States. For such purpose such obligations may be acquired (1) on original issue at par, or (2) by purchase of outstanding obligations at the market price. The purposes for which obligations of the United States may be issued under Section 752 of Title 31, are hereby extended to authorize the issuance at par of special obligations exclusively to the Fund. Such special obligations shall bear interest at a rate equal to the average rate of interest, computed as of the end of the calendar month next preceding the date of such issue, borne by all interest-bearing obligations of the United States then forming part of the public debt;

Hon. Orville S. Carpenter, Page 6

except that where such average rate is not a multiple
of one-eighth of 1 per centum, the rate of interest of
such special obligations shall be the multiple of one-
eighth of 1 per centum next lower than such average rate.
Obligations other than such special obligations may be
acquired for the fund only on such terms as to provide
an investment yield not less than the yield which would
be required in the case of special obligations if issued
to the fund upon the date of such acquisition.

"(c) Any obligations acquired by the Fund (except
special obligations issued exclusively to the Fund) may
be sold at the market price, and such special obligations
may be redeemed at par plus accrued interest.

"(d) The interest on, and the proceeds from the sale
or redemption of, any obligations held in the Fund shall
be credited to and form a part of the Fund.

"(e) The fund shall be invested as a single fund,
but the Secretary of the Treasury shall maintain a separate
book account for each State agency and the railroad unem-
ployment insurance account and shall credit quarterly on
March 31st, June 30, September 30, and December 31, of
each year, to each account, on the basis of the average
daily balance of such account, a proportionate part of the
earnings of the fund for the quarter ending on such date.

"(f) The Secretary of Treasury is authorized and
directed to pay out of the Fund to any State agency such
amount as it may duly requisition, not exceeding the
amount standing to the account of such State agency at the
time of such payment. The Secretary of the Treasury is
authorized and directed to make such payments out of the
fund as the Railroad Retirement Board may duly certify,
not exceeding the amount standing to the railroad unem-
ployment insurance account at the time of such payment."

Section 903 of the Social Security Act (42 U.S.C.A. 1103)
makes it a condition of approval by the Social Security Board of a
State Unemployment Compensation Law that "all money withdrawn from
the Unemployment Trust Fund by the State Agency shall be used sole-
ly in the payment of compensation, exclusive of expenses of adminis-
tration." In regard to expenses incident to the administration of
the Texas Unemployment Compensation Act, Sec. 11 of said Act creates
a Special Fund in the State Treasury for that purpose as follows:

Hon. Orville S. Carpenter, Page 7

"(a) Special Fund: There is hereby created in the State Treasury a special fund to be known as the Unemployment Compensation Administration Fund. All moneys deposited or paid into this Fund are hereby appropriated and made available to the Commission. All moneys in this Fund shall be expended solely for the purpose of defraying the cost of the administration of this Act, and for no other purpose whatsoever. The Fund shall consist of all moneys appropriated by this State, and all moneys received from the United States of America, or any agency thereof, including the Social Security Board and the United States Employment Service, all moneys collected by the Commission as costs or fees charged by the Commission for furnishing photostatic or certified copies of records of the Commission, or fees charged by the Commission for making audits pursuant to the authority granted in this Act, or from any other source, for such purpose, and shall be administered separate and apart from all public moneys or funds of the State. All moneys in this Fund shall be deposited, administered, and disbursed, in the same manner and under the same conditions and requirements as is provided by law for other special funds in the State Treasury. Any balances in this Fund shall not lapse at any time, but shall be continuously available to the Commission for expenditure consistent with this Act. . ."

The foregoing Unemployment Compensation Administration Fund is fed by grants thereto by the Federal Government under Sections 301 and 302 of the Social Security Act (42 U.S.C.A. Sections 501 & 502) which read as follows:

"Sec. 501. For the purpose of assisting the States in the administration of their unemployment compensation laws, there is hereby authorized to be appropriated, for the fiscal year ending June 30, 1936, the sum of $4,000,000.00, and for each fiscal year thereafter the sum of $49,000,000, to be used as hereinafter provided.

"Sec. 502. (a) The Board shall from time to time certify to the Secretary of the Treasury for payment to each State which has an unemployment compensation law approved by the Board under section 1103 of this chapter, such amounts as the Board determines to be necessary for the proper administration of such law during the fiscal year in which such payment is to be made. The Board's determination shall be based on (1) the population of

Hon. Orville S. Carpenter, Page 8

the State; (2) an estimate of the number of persons covered by the State law and of the cost of proper administration of such law; and (3) such other factors as the Board finds relevant. The Board shall not certify for payment under this section in any fiscal year a total amount in excess of the amount appropriated therefor for such fiscal year.

"(b) Out of the sums appropriated therefor, the Secretary of the Treasury shall, upon receiving a certification under subsection (a), pay, through the Division of Disbursement of the Treasury Department and prior to audit or settlement by the General Accounting Office, to the State agency charged with the administration of such law the amount so certified."

By the foregoing portion of this opinion we have outlined the establishment and purpose of the various state and federal funds of the social security systems sponsored by the Federal and State Governments, as such funds existed before the advent of the Railroad Unemployment Insurance Act on June 25, 1938, which so radically altered the status of these funds and gave rise to the instant inquiry. Theretofore, the Federal Government had elected to leave with the reserved power of the various states all employment relations, both interstate and intrastate, being content with grants-in-aid to such states by way of appropriations out of the general revenues of sufficient sums, not in excess of the maximum fixed by Congress, for administrative expenses of the various State Unemployment Compensation Acts. This action on the part of Congress was upheld in the case of Chas. C. Steward Machine Company vs. Davis, supra, on the ground that the operations of the State Unemployment Compensation Laws would relieve the Federal Government of a portion of the potential relief burden, and such reasonable protection of the Federal Treasury was part of general welfare in a constitutional sense. With the passage of the Railroad Unemployment Insurance Act, the Congress, for the first time, elected to preempt the field of unemployment compensation in so far as employer-employee relationships of interstate common carriers were concerned, and it is settled by the authorities that in such a case the legislation of a state, in conflict with the exercise by Congress of its constitutional power over interstate commerce, is superseded and displaced. 9 Tex. Jur. p. 288-290, and cases cited. The Railroad Unemployment Insurance Act of 1938 provides a comprehensive and complete system of unemployment compensation for employees of common carriers engaged in interstate commerce and would necessarily conflict with the provisions of the Texas Unemployment Compensation Act upon the same subject. While this, of itself, would cause the State statute upon this score to yield, the Congress has removed all doubt of its intentions

Hon. Orville S. Carpenter, Page 9

to preempt this field by Section 13 (a) of the Railroad Unemployment Insurance Act, (45 U.S.C.A. 363),providing as follows:

> "(a) By enactment of this chapter the Congress makes exclusive provision for the payment of unemployment benefits for unemployment occurring after June 30, 1939, based upon employment (as defined in this chapter). No employee shall have or assert any right to unemployment benefits under an unemployment compensation law of any State with respect to unemployment occurring after June 30, 1939, based upon employment (as defined in this chapter). The Congress finds and declares that by virtue of the enactment of this chapter, the application of State unemployment compensation laws after June 30, 1939, to such employment, except pursuant to section 362 (g) of this chapter, would constitute an undue burden upon, and an undue interference with the effective regulation of, interstate commerce. In furtherance of such determination, after June 30, 1939, the term 'person' as used in section 1106 of the Title 42 shall not be construed to include any employer (as defined in this chapter) or any person in its employ: Provided, That no provision of this chapter shall be construed to affect the payment of unemployment benefits with respect to any period prior to July 1, 1939, under an unemployment compensation law of any State based upon employment performed prior to July 1, 1939, and prior to such date employment as defined in this chapter shall not constitute 'Service with respect to which unemployment compensation is payable under an (or 'service under any') unemployment compensation system (or 'plan') established by an Act of Congress' (or 'a law of the United States') or 'employment in interstate commerce, of an individual who is covered by an unemployment compensation system established directly by an Act of Congress,' or any term of similar import, used in any unemployment compensation law of any State."

The Railroad Unemployment Insurance Act provides a schedule of "contributions" and "benefits" as other unemployment compensation laws and is complete in all of its administrative details, which we deem not necessary to discuss. Section 11 of the Act (45 U.S.C.A. Sec. 361) establishes in the Treasury of the United States a fund to be known as the Railroad Unemployment Insurance Administration Fund, and provides for its appropriation and availability for administrative expenses, but as no part of the four million dollars involved in your inquiry will find its way into this Fund, we are not concerned with it further than to make note of this fact. The Railroad Unemployment Insurance Fund, or rather Account within a Fund, created

Hon. Orville S. Carpenter, Page 10

by the Railroad Unemployment Insurance Act is the particular account with which we are concerned, because it is into this account that the four million dollars will go if a transfer thereof is effected by you. Hence we quote Section 10 (a-b) of the Railroad Unemployment Insurance Act (45 U.S.C.A. Sec. 360 (a) & (b), establishing the Railroad Unemployment Insurance Account.

"(a) The Secretary of the Treasury shall maintain in the unemployment trust fund established pursuant to section 1104 of Title 42 an account to be known as the railroad unemployment insurance account. This account shall consist of (i) 90 per centum of all contributions collected pursuant to section 358 of this chapter, together with all interest thereon collected pursuant to section 358 of this chapter; (ii) all amounts transferred or paid into the account pursuant to section 363 or section 364 of this chapter; (iii) all additional amounts appropriated to the account in accordance with any provision of this chapter or with any provision of law now or hereafter adopted; (iv) a proportionate part of the earnings of the unemployment trust fund, computed in accordance with the provisions of section 1104 (e) of Title 42; (v) all amounts realized in recoveries for overpayment or erroneous payments of benefits; (vi) all amounts transferred thereto pursuant to section 361 of this chapter; (vii) all fines or penalties collected pursuant to the provisions of this chapter; and (viii) all amounts credited thereto pursuant to section 352 (g) or section 362 (g) of this chapter. Notwithstanding any other provision of law, all moneys credited to the account shall be mingled and undivided, and are hereby permanently appropriated to the Board to be continuously available to the Board without further appropriation, for the payment of benefits and refunds under this chapter, and no part thereof shall lapse at any time, or be carried to the surplus fund or any other fund.

"(b) All moneys in the account shall be used solely for the payment of the benefits and refunds provided for by this chapter. The Board shall, from time to time, certify to the Secretary of the Treasury the name and address of each person or company entitled to receive benefits or a refund payment under this chapter, the amount of such payment, and the time at which it shall be made. Prior to audit or settlement by the General Accounting Office, the Secretary of the Treasury, through the Division of Disbursements of the Treasury Department, shall make payments from the account directly to such person or company of the amount of benefits or refund so certified by the Board: Provided,

Hon. Orville S. Carpenter, Page 11

however, That if the Board shall so request, the Secretary of the Treasury, through the Division of Disbursements of the Treasury Department, shall transmit benefits payments to the Board for distribution by it through employment offices or in such other manner as the Board deems proper."

Not for the purpose of coercing the Texas Unemployment Compensation Commission and similar state agencies of other states into transferring to the Railroad Unemployment Insurance Account, above described, such sums as have by them been collected as "contributions" from employers engaged in interstate commerce, but merely as a form of mild moral suasion to this end, the Congress, by Sec. 13 (c) of the Railroad Unemployment Insurance Act (45 U. S. C.A. Sec. 363 (c) withdraws further grants-in-aid to the various states by way of administrative expenses in the same amount as such "contributions" collected but not transferred. We quote:

"(c) The Social Security Board shall withhold from certification to the Secretary of the Treasury for payment the amounts determined by it pursuant to section 502 (a) of Title 42 to be necessary for the proper administration of each State's unemployment-compensation law, until an amount equal to its 'preliminary amount' plus interest from July 1, 1939, at 2 1/2 per centum per annum on such portion thereof as has not been used as the measure for withholding certification for payment, has been so withheld from certification pursuant to this paragraph: Provided, however, That if a State shall, prior to whichever is the later of (i) thirty days after the close of the first regular session of its legislature which begins after the approval of this chapter, and (ii) July 1, 1939, authorize and direct the Secretary of the Treasury to transfer from its account in the unemployment trust fund to the railroad unemployment-compensation account in the unemployment trust fund an amount equal to its 'preliminary amount', no amount shall be withheld from certification for payment to such State pursuant to this paragraph.

"The Social Security Board shall withhold from certification to the Secretary of the Treasury for payment the amounts determined by it pursuant to section 502 (a) of Title 42 to be necessary for the proper administration of each State's unemployment compensation law, until an amount equal to its 'liquidating amount' plus interest from January 1, 1940, at 2 1/2 per centum per annum on

Hon. Orville S. Carpenter, Page 12

such portion thereof as has not been used as the measure
for withholding certification for payment has been so
withheld from certification pursuant to this paragraph:
Provided, however, That if a State shall, prior to which-
ever is the later of (i) thirty days after the close of the
first regular session of its legislature which begins
after the approval of this chapter, and (ii) January 1,
1940, authorize and direct the Secretary of the Treasury
to transfer from its account in the unemployment trust
fund to the railroad unemployment compensation account
in the unemployment trust fund an amount equal to its
'liquidating amount', no amount shall be withheld from
certification for payment to such State pursuant to this
paragraph."

Section 13 (b) of the Railroad Unemployment Insurance Act
(45 U.S.C.A. Sec. 363 (b)) sets forth the methods for computing the
two sums to be transferred under the foregoing provisions, and re-
ferred to in your letter as the "preliminary amount" and the
"liquidating amount." We quote:

"(b) The Social Security Board is hereby directed to
determine for each State, after agreement with the Rail-
road Retirement Board, and after consultation with such
State; the total (hereinafter referred to as the 'pre-
liminary amount') of (i) the amount remaining as the bal-
ances of reserve accounts of employers as of June 30,
1939, if the unemployment compensation law of such State
provides for a type of fund known as 'Reserve Accounts',
plus (ii) if the unemployment compensation law of such
State provides for a type of fund known as 'pooled Fund'
or 'pooled Account', that proportion of the balance of
such fund or account of such State as of June 30, 1939,
as the amount of taxes or contributions collected from
employers and their employees prior to July 1, 1939,
pursuant to its unemployment compensation law and cred-
ited to such fund or account bears to all such taxes or
contributions theretofore collected from all persons sub-
ject to its unemployment compensation law and credited to
such fund or account; and the additional amounts (herein-
after referred to as the 'liquidating amount') of taxes
or contributions collected from employers and their em-
ployees from July 1, 1939 to December 31, 1939, pursuant
to its unemployment compensation law."

Hon. Orville S. Carpenter, Page 13

Thus we see that two courses are open to the State of Texas under the above quoted provisions of the Railroad Unemployment Insurance Act: (1) either to authorize and direct the Secretary of the Treasury to transfer from its account in the Unemployment Trust Fund to the Railroad Unemployment Compensation Account in such Fund, amounts equal to the "preliminary amount" and "liquidating amount," computed as above provided, thereby continuing to enjoy the grants or appropriations from the Federal Treasury to the State Unemployment Compensation Administration Fund to defray the expenses of administering the Texas Unemployment Compensation Act, or,(2) in the alternative, to refuse such authorization for a transfer, and be forthwith denied the further benefits of such grants or appropriations for administrative expenses to the extent and in the amount only, however, of such "preliminary amount" and "liquidating amount," estimated by you to be $4,000,000. If the latter course is pursued, the State is accorded the right to withdraw from its particular account in the Unemployment Trust Fund and use for administrative expenses of the State Unemployment Compensation Act, such amount as was withheld from certification for this purpose from the Federal Treasury. The provisions governing the mechanics and balancing of these transfers and withdrawals to and from the Funds affected are embodied in Section 13 (d) and (e) of the Railroad Unemployment Insurance Act (45 U.S.C.A. Sec. 363 (d) and (e) reading as follows:

"(d) The transfers described in the provisos contained in the several paragraphs of subsection (c) of this section shall not be deemed to constitute a breach of the conditions set forth in sections 503 (a) (5) and 1103 (a) (4) of Title 42; nor shall the withdrawal by a State from its account in the unemployment trust fund of amounts, but not to exceed the total amount the Social Security Board shall have withheld from certification with respect to such State pursuant to subsection (c) of this section, be deemed to constitute a breach of the conditions set forth in sections 503 (a) (5) and 1103 (a) (4) of Title 42, provided the moneys so withdrawn are expended solely for expenses which the Social Security Board determines to be necessary for the proper administration of such State's unemployment compensation law.

"(e) The Social Security Board is authorized and directed to certify to the Secretary of the Treasury for payment, and the Secretary shall pay, into the railroad unemployment insurance account, such amounts as the Social Security Board withholds from certification pursuant to subsection (c) of this section and the appropriations auth-

Hon. Orville S. Carpenter, Page 14

orized in section 501 of Title 42 shall be available for payments authorized by this subsection. The Secretary shall transfer from the account of a State in the unemployment trust fund to the railroad unemployment insurance account in the unemployment trust fund such amounts as the State authorizes and directs him so to transfer pursuant to subsection (c) of this section."

By the enactment of House Bill 759, Acts Regular Session, 46th Legislature, the Legislature of Texas exercised its option and indicated its decision to be governed by the provisions of the Railroad Unemployment Insurance Act hereinabove quoted, relating to the transfer of moneys in the statutory amount from the Unemployment Trust Fund to the Railroad Unemployment Insurance Account in such Fund, and to continue to receive grants or appropriations for expenses incident to the administration of the Texas Unemployment Compensation Act. Inasmuch as this enabling act is merely declaratory of the pertinent provisions of the Railroad Unemployment Insurance Act hereinabove set out we deem it not necessary to further lengthen this opinion by quoting same here.

From this tedious but, to our mind, necessary statement of the pertinent provisions of the cited Federal and State statutes leading to the enactment of House Bill No. 759, Acts Regular Session, 46th Legislature, we turn to a consideration of the constitutionality of the latter statute. In this connection, the following questions emerge for our determination:

1. The respective right, title, interest and claim of the United States and of the State of Texas in and to moneys in the Unemployment Trust Fund in the Federal Treasury, a portion of which, to the extent of approximately four million dollars, is sought to be transferred by the Act under consideration.

2. Is House Bill No. 759, Acts, Regular Session, 46th Legislature, invalid as a product of coercion by the Federal Government.

3. Are the so-called "contributions" levied and collected under the Texas Unemployment Compensation Act from "employers" in this State, as defined in said Act, a portion of which contributions comprise the four million dollars involved herein, to be considered as (a) public moneys or revenues levied and collected by the State of Texas from such "employers" under its powers of taxation; (b) license fees or exactions collected under the police power of the State; (c) a trust fund earmarked for the specific purpose of unemployment relief, held by the State as trustee for the "employers"

Hon. Orville S. Carpenter, Page 15

who furnished the contributions making up such fund, and in which fund such "employers" have a vested interest; (d) trust funds held by the State as trustee for "employees," entitled to benefits under the Texas Unemployment Compensation Act, and in which funds such employees have a vested right.

4. Is House Bill No. 759, Acts, Regular Session, 46th Legislature, considering the fund or moneys sought to be transferred thereby under any of the foregoing aspects, violative of Article 8, Section 6, Constitution of Texas, providing that no money shall be drawn from the Treasury but in pursuance of specific appropriations made by law.

5. Is said statute in contravention of Article 3, Section 51, Constitution of Texas, providing that the Legislature shall have no power to make any grants or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporation whatsoever.

6. Is said statute violative of Article 16, Section 6, Constitution of Texas, providing that no appropriation for private or individual purposes shall be made.

In approaching these various questions, we think the respective rights and claims of the Federal and State Governments in and to the sums sought to be transferred from the Unemployment Fund to the Railroad Unemployment Insurance Account should first be determined. As pointed out heretofore, this sum represents that portion of "contributions" heretofore collected from "employers" subject to the Texas Unemployment Compensation Act, but removed from its operation by the enactment of the Railroad Unemployment Insurance Act. By this latter statute and by an appropriate amendment to the Texas Unemployment Compensation Act, "employers" engaged in interstate commerce by rail were removed from the State Act and placed within the purview of the Railroad Unemployment Insurance Act, because Congress determined that the collection by the State of Texas of "contributions" from such "employer" would constitute a burden on interstate commerce. But until the Congress preempted this field and declared its intention so to do by statute, we do not find, under the authorities, that "contributions" theretofore

Hon. Orville S. Carpenter, Page 16

paid into the State Unemployment Compensation Fund or transferred to the Unemployment Trust Fund in the Federal Treasury for investment, were illegal exactions under the commerce clause of the Federal Constitution, which the State of Texas had no right to collect and which must therefore be turned into the Railroad Unemployment Insurance Account in the Federal Treasury as moneys and funds belonging to the Federal Government.

All moneys and funds collected by the Texas Unemployment Compensation Commission by way of "contributions" from "employers" subject to the State Act, whether engaged in interstate commerce or intrastate commerce, were first placed in the Unemployment Compensation Fund in accordance with Section 7 of said Act and were "mingled and undivided," without regard to the nature of the business of the "employers" from whom such "contributions" were collected. After passing through the "clearing account" of said Unemployment Compensation Fund, all such moneys without regard to origin, were immediately deposited with the Secretary of the Treasury of the United States, to the credit of the account of this State in the Unemployment Trust Fund, established and maintained pursuant to Section 904 of the Social Security Act, as amended, hereinabove set out. Section 7 of the Texas Unemployment Compensation Act makes provision for the withdrawal of moneys from such Unemployment Trust Fund for the payment of benefits in this State as follows:

"(c) Withdrawals: Moneys shall be requisitioned from this State's account in the Unemployment Trust Fund solely for the payment of benefits and in accordance with regulations prescribed by the Commission. The Commission shall from time to time requisition from the Unemployment Trust Fund such amounts, not exceeding the amounts standing to its account therein, as it deems necessary for the payment of benefits for a reasonable future period. Upon receipt thereof the Treasurer shall deposit such moneys in the benefit account and the Comptroller shall issue his warrants for the payment of benefits solely from such benefit account. Expenditures of such moneys in the benefit account and refunds from the clearing account shall not be subject to any provisions of law requiring specific appropriations or other formal release by State officers of money in their custody. All warrants issued for the payment of benefits and refunds shall bear the signature of the Treasurer and the countersignature of a member of the Commission or its duly authorized agent for that purpose. Any balance of moneys requisitioned from the Unemployment Trust Fund which remains unclaimed or unpaid in the benefit account after the expiration of the period for which

Hon. Orville S. Carpenter, Page 17

such sums were requisitioned shall either be deducted
from estimates for, and may be utilized for the payment
of, benefits during succeeding periods, or in the
discretion of the Commission, shall be redeposited with
the Secretary of the Treasury of the United States of
America, to the credit of this State's account in the
Unemployment Trust Fund as provided in subsection (b) of
this section."

State statutes similar to the foregoing have come before
the courts of other jurisdictions for construction in the cases of
Gillum vs. Johnson, 62 Pac. (2d) 1037; W. E. Chamberlain vs.
Andrews, 2 N. E. (2d) 22; Chas. C. Steward Co. vs. Davis, 57 Sup.
Ct. 883, 301 U. S. 548, and it was uniformly held that the
Federal Government did not obtain title to moneys deposited in
the Unemployment Trust Fund of the United States Treasury but
rather held it in trust, for investment purposes, for the appro-
priate state agencies charged with the administration of the
various state unemployment compensation acts. The beneficial
title in such moneys remains in the State, never leaving the power
and control of the State authorities, and the Secretary of the
Treasury will honor a requisition for the whole or any part of
the deposit in the Fund whenever one is made by the appropriate
state official.

Therefore, we see that the claim, right and title of the
State of Texas in and to the moneys collected in the past by way
of "contributions" from "employers" in Texas subject to our Unem-
ployment Compensation Act, and, pursuant to statute, transferred
to the Unemployment Trust Fund in the Federal Treasury, for custody
and investment purposes, is complete and unimpaired to the same
extent as if such funds or moneys had been deposited in one of the
State depositories, subject to withdrawal at any time. Recognition
of this fact is accorded by the provisions of the Railroad Unem-
ployment Insurance Act hereinabove quoted, affording this and other
States similarly situated, the option of transferring that portion
of the Unemployment Trust Fund called "preliminary account" and
"liquidating account," into an account withinsaid fund known as
the Railroad Unemployment Insurance Account. This transfer could
not be coerced by the Railroad Unemployment Insurance Act, but
as a very persuasive inducement to this end, the Congress provided
that if the several states did not make such transfer, then grants
or appropriations for administrative expenses of the state unem-
ployment acts would be withheld in that amount of the fund which
the State refused to transfer. The Act of our Texas Legislature
under consideration here, in authorizing and directing you to make

Hon. Orville S. Carpenter, Page 18

this transfer, was a free and voluntary acceptance by this State of the terms and conditions of the Railroad Unemployment Insurance Act. It follows therefore, under our second question, that said statute is not invalid as a product of unconstitutional coercion by the Federal Government and a subsequent surrender of State sovereignty. This is in accord with the principle announced in the case of Carmichael v. So. Coal & Coke Co., 57 Sup. Ct. 868; 301 U. S. 495.

It now becomes necessary, in logical sequence, to determine the exact nature and status of these funds in order to determine whether the Legislature, by the Act in question, could assert control over them to the extent of an approximate $4,000,000, by directing such amount to be transferred to purposes and uses beyond the present scope of the law under which it was collectd and beyond the control and management of the State agency charged with the administration of such act and such funds. The exact limits to this inquiry are stated in our third question above.

In construing the Unemployment Compensation Laws of the State of Massachusetts, substantially identical to the Texas Statute upon this subject, the Supreme Court of Massachusetts in Howes Brothers Co. vs. Mass. Unemployment Compensation Commission, 5 N. E. (2d) 720, held that such statute was enacted in the exercise of the police power rather than the tax power, in furtherance of the public health, safety, morals and the general welfare. It was pointed out that said act did not throw the burden of its expense upon funds obtained by general taxation but put that burden upon the employers and employees most closely related to and responsible for the condition of unemployment sought to be remedied by the Act. It was further pointed out that while contributions paid by employers were manifestly received on account of the Commonwealth, such contributions were not part of the general revenue of the Commonwealth, although paid into the State Treasury, but being raised for a particular purpose through the exercise of the police power could not be diverted to any other purpose. To the same effect is a decision by the Supreme Court of California upon the Unemployment Compensation Law of that State, closely paralleling the Texas Statute, in the case of Gillum v. Johnson, 62 Pac. (2d) 1037. In other decisions the analogy between Unemployment Compensation Acts designed to assess or to collect from a particular class in order to build up a trust fund for paying benefits to unemployed workmen, and Workmen's Compensation Acts likewise creating a fund at the expense of employers and earmarking same for payment to injured employees, is pointed to in connection with various constitutional limitations against the diversion by a State Legislature of funds held in trust for specified purposes. State v. Olson, 175 N. W. 714; State v. Industrial Commission, 155 N. E. 101; In re Farrell, 211 Fed. 212; State v. Clausen, 117 Pac. 1101.

Hon. Orville S. Carpenter, Page 19

If otherwise constitutional, it is our opinion that House Bill 759, Acts, Regular Session, 46th Legislature, is not unconstitutional under the principles announced in the foregoing authorities, as being an unlawful and invalid diversion of moneys or funds collected from a particular class of persons in Texas for their benefit or for the benefit of another particular class of persons, and therefore earmarked and dedicated as a trust fund in which said employers or employees in Texas, both or either, have vested beneficial interests. This conclusion is grounded upon the proposition, first, that "employers" and "employees", as defined in the Unemployment Compensation Act of Texas, are not given, under said statute and the Constitution of Texas, any vested right or interest in and to the "contributions" collected from "employers", but, on the contrary, such concept of vested rights is expressly denied; and secondly, this conclusion is reached because we find that the moneys and funds on deposit either in the Unemployment Compensation Fund in the State Treasury or the Unemployment Trust Fund in the Federal Treasury, including the four million dollars involved here, is to be considered as public moneys in the Treasury of the State and a part of its general revenues, subject to appropriation or other disposition by Acts of the Legislature which do not otherwise impinge upon some controlling provision of our Constitution.

The latter position is taken because we consider that such moneys or funds are collected under the powers of taxation of the State of Texas and are not referable to the police power. We say that the "contributions" levied upon and collected from "employers", as defined in the Texas Unemployment Compensation Act, are, essentially and fundamentally, excise taxes upon the privilege or relationship of employment in Texas, the right to levy such tax being recognized by the decisions of the Supreme Court and inferior tribunals of the State and Nation. The moving purpose of this payroll levy is to create a sufficient amount of revenues to alleviate the recurrent conditions arising from unemployment. This is a proper and constitutional duty and function of the State, and in recognition thereof large appropriations have heretofore been made and "bread bonds" issued. Although, revenues for this purpose are usually raised by taxes levied and collected upon property and persons generally in Texas, we find nothing in the Constitution to prevent the Legislature, in lieu of this method, from levying a tax upon that class of employers most directly connected with the problem, even though in the same act, provision is made for the paying out of such collections in the form of benefits to another class, i.e. certain qualified employees. We do not think this feature makes the act a regulatory measure under the police power nor does it constitute the moneys collected thereunder a trust fund in which either employers or employees have any vested interest. As authority

for this holding, we stand upon the cases of Carmichael, et al vs. Southern Coal & Coke Co., 57 Sup. Ct. 868, 301 U. S. 495; Cincinnati Soap Co. vs. U. S., 57 Sup. Ct. 764, 301 U. S. 308; Beeland Wholesale Co. vs. Kaufman, 174 So. 516. The Supreme Court of Alabama in the case of Beeland Wholesale Co. vs. Kaufman, supra, and the Supreme Court of the United States in the case of Carmichael vs. Southern Coal & Coke Co., supra, in upholding the validity and constitutionality of the Unemployment Compensation Act of Alabama, identical in its main aspects to the Texas Act, held the contribution levied by the Alabama Act upon employers to be an excise tax upon the privilege or right to employ, despite the restricted purposes for which the funds realized from such tax were used and the apparent want of relationship between the subject of the tax, the employer, and the beneficiary of the tax, the employee. This holding was based upon the principle of taxation announced in the case of Cincinnati Soap Co. vs. United States, supra, to the effect that if a tax is good as a tax and the specified purpose to which the proceeds are to be devoted is one which would sustain a subsequent and separate appropriation out of the general funds of the treasury, neither is made invalid by being bound to the other in the same act of legislation.

In recognition of the proposition that the so-called "contribution" exacted by the Texas Unemployment Compensation Act of and from certain designated "employers" was referable to the tax power rather than the police power, and the taxes or funds derived therefrom were "public moneys" subject to appropriation of disposition in any manner the Legislature of Texas might see fit, subject to controlling constitutional provisions, the Legislature of Texas in this very Act provides as follows:

"Benefits shall be deemed to be due and payable under this Act only to the extent provided in this Act and to the extent that moneys are available therefor to the credit of the Unemployment Compensation Fund, and neither the State nor the Commission shall be liable for any amount in excess of such sums." Art. 5221b-16, V.A.C.S. 1925

"Saving Clause: The Legislature reserves the right to amend or repeal all or any part of this Act at any time; and there shall be no vested private right of any kind against such amendment or repeal. All the rights, privileges, or immunities conferred by this Act or by acts done pursuant thereto shall exist subject to the power of the Legislature to amend or repeal this Act at any time." Art. 5221b-19, V.A.C.S. 1925.

In this connection, however, we think we should point to Section 20 (c) of the Texas Unemployment Compensation Act providing

Hon. Orville E. Carpenter, Page 21

for a refund to individual contributors thereunder in the event it should be determined and held by the courts that the provision thereof imposing compulsory contributions is invalid and void, and to Section 22 of said Act providing for the termination of the entire Act and the return ratably to those making "contributions," such portion of the Fund as remained unexpended, in the event the Supreme Court of the United States should hold the Federal Social Security Act to be unconstitutional or inoperative for any reason. Neither of these contingencies have occurred. The last quoted provision for refund will never become operative because the Federal Social Security Act has been in all things upheld as constitutional by the Supreme Court in the case of Chas. C. Steward Mach. Co. vs. Davis, supra, and the other provision for refund of "contributions" cannot become operative as to the Fund in question because it does not appear from your letter that such "contributions" were paid under proper protest so as to be refundable, in the event our Unemployment Compensation Act should be held invalid by the court. We deem this payment under protest to be necessary because Section 20 (b) of the Texas Act provides that "in the event the provisions of this Act which impose contributions, are held invalid or void, all payments which have been <u>voluntarily</u> made under the provisions of the Act shall be and remain the property of the fund to which they are deposited." However, should any "contributions" or taxes, making up the $4,000,000 here, have been collected from and paid by "employers" engaged in interstate commerce, under proper protest, and within the protest period, the Texas Unemployment Act should be stricken by the courts as unconstitutional, then a right to refund, under the foregoing provisions would ensue.

However, at this juncture and in connection with the foregoing discussion, we wish to make it plain that we are not passing on the constitutionality of the Texas Unemployment Compensation Act but only upon the constitutionality of House Bill 759, Acts, Regular Session, 46th Legislature. Therefore, except as incidental to the instant inquiry, we do not go into the question of whether the Texas Unemployment Compensation Act contravenes Article 8, Section 3, Constitution of Texas, providing that taxes shall be levied and collected for public purposes only, or any other constitutional provision going to the validity of the Unemployment Compensation Act, prior to its amendment by the Act under consideration. Our purpose is limited to showing that the money involved here is "public money" and to a discussion of the constitutional provisions governing its appropriation or disposal.

Having determined from the foregoing discussion that H. B. No. 759, Acts, Regular Session, 46th Legislature, in amending the Texas Unemployment Compensation Act so as to remove from the scope

Hon. Orville S. Carpenter, Page 22

and operation thereof, "contributions" levied upon and "benefits" paid to "employers" and "employees" respectively, engaged in interstate commerce, and authorizing and directing the transfer of an approximate four million dollars of such "contributions" from the Unemployment Trust Fund in the Federal Treasury to the Railroad Unemployment Insurance Account in such Fund, does not, in violation of State and Federal Constitutions, disturb vested rights of said "employers" or "employees," either or both, in and to said money, on the theory of a trust fund; and having further established that the moneys standing to the credit of the State of Texas in said Unemployment Trust Fund of the Federal Treasury, including the four million dollars involved here, constitutes a part of the general revenues of this State, realized from taxation, and subject to lawful appropriation or disposition by the Legislature, we now address ourselves to a determination of whether or not the attempted transfer and disposition of same by House Bill 759 contravenes any of the sections of the Texas Constitution adverted to in questions four to seven, stated at the outset of this discussion. We think beyond all doubt this Act satisfies the requirements of Article 8, Section 6, Constitution of Texas, for a valid and specific appropriation. Although not in the form of an appropriation bill, Section 9a of said bill (Sec. 7a of the Unemployment Compensation Act) clearly effects an appropriation of the money in question for the specific purpose of use by the appropriate agency of the Federal Government in the administration of the Railroad Unemployment Insurance Act. It has been held sufficient if the Legislature, in any manner and without regard to form, authorizes the expenditure by law, and specifies the purpose for which the appropriation is made. 38 Tex. Jur. 844; Terrell vs. Sparks, 104 Tex. 191, 135 S. W. 519.

Moreover, the fact that the exact sum in dollars and cents is not set forth in that section of the act making the appropriation does not render it unconstitutional. Two amounts are appropriated known as "preliminary amount" and "liquidating amount" and procedure is provided for determining and fixing these exact amounts. This brings the statute within the case of Atkins vs. State Highway Department, 201 S. W. 226, and sustains its validity.

Finally we are brought to a determination of the constitutionality of House Bill No. 759, Acts, Regular Session, 46th Legislature, when tested by Article 3, Section 51, Constitution of Texas, providing that the Legislature shall have no power to make any grants or authorize the making of any grants of public money

to any individual, association of individuals, municipal or other corporation whatsoever, and Article 16, Section 6, Constitution of Texas, providing that no appropriation for private or individual purposes shall be made. House Bill 759, Acts, Regular Session, 46th Legislature, is a "grant of public money" within the meaning of Article 3, Section 51 of the Constitution, but such grant is not made to "any individual, association of individuals, municipal or other corporation whatsoever," because the Federal Government or any of its duly constituted agencies cannot be reasonably or fairly brought within those terms. Neither is the appropriation effected by this Act for a "private or individual purpose" within the prohibition of Article 16, Section 6 of the Constitution, or a gift or grant to prohibited individuals for non-governmental purposes within the letter or spirit of the restriction contained in Article 3, Section 51, Constitution of Texas.

Many cases recognize the authority of the Federal Government to select and designate any of the individual states of the Union as its agent to further its constitutional functions and powers. Conversely, while not supported by equal authority, we see no reason why the State of Texas cannot, in the exercise of its reserved power to care for the unemployment problem incident to common carriers engaged in interstate commerce, select as its agent the Board charged with the administration of the Railroad Unemployment Insurance Act and appropriate money to be expended by said Board in accordance with that Act. Conceding that, by reason of the Railroad Unemployment Insurance Act, this State can no longer exact "contributions" from "employers" engaged in interstate commerce, the reserved right to appropriate funds for the relief of unemployment existing within the borders of Texas, whether arising out of interstate or intrastate commerce, remains with the State and cannot be impaired or removed by any Act of Congress. Likewise, the relief of unemployment in the various states is a matter involving the general welfare of the United States, and for that purpose, appropriations by Congress for the relief of unemployment have been upheld. Consequently, we see that the relief of unemployment is the concurrent common concern of both the United States and the State of Texas, both co-existing within the same territory. The Federal Social Security Act and Railroad Unemployment Insurance Act, for the Government, and the Texas Unemployment Compensation Act, for the State, are inter-related in all their terms and conditions, and embody a cooperative legislative effort by the two sovereignties for carrying out a public purpose common to both, which neither

Hon. Orville S. Carpenter, Page 24

could fully achieve without the cooperation of the other. The Supreme Court of the United States has found nothing in the Federal Constitution prohibiting such cooperation, and we do not feel impelled to go so far as to say that the foregoing prohibitions of the Texas Constitution were ever intended to prevent the passage of an Act, such as the one before us, designed to effectuate this common purpose. Although concerned only with the constitutionality of the Social Security Act or that part thereof requesting the various states to deposit moneys collected under their unemployment compensation in the Unemployment Trust Fund of the Treasury, the language of the Supreme Court of the United States, in the case of Charles C. Steward Machine Co. vs. Davis, supra, is enlightening upon the right of a state, in the exercise of its sovereignty, to voluntarily, either by contract or by statute, accept an offer of the Federal Government, looking to a better solution of their common problem of unemployment. We quote:

"The inference of abdication thus dissolves in thinnest air when the deposit is conceived of as dependent upon a statutory consent, and not upon a contract effective to create a duty. By this we do not intimate that the conclusion would be different if a contract were discovered. Even sovereigns may contract without derogating from their sovereignty. Perry v. United States, 294 U.S. 330, 353, 55 S. Ct. 432, 436, 95 A.L.R. 1335, 79 L. Ed. 912; 1 Oppenheim, International Law (4th Ed) §§ 493, 494; Hall, International Law (8th Ed.) § 107; 2 Hyde, International Law, § 489. The states are at liberty, upon obtaining the consent of Congress, to make agreements with one another. Constitution, art. 1, § 10, par. 3. Poole vs. Fleeger, 11 Pet. 185, 209, 9 L.Ed. 680; Rhode Island vs. Massachusetts, 12 Pet. 657, 725, 9 L. Ed. 1233. We find no room for doubt that they may do the like with Congress if the essence of their statehood is maintained without impairment. Alabama is seeking and obtaining a credit of many millions in favor of her citizens out of the Treasury of the nation. Nowhere in our scheme of government - in the limitations express or implied of our Federal Constitution - do we find that she is prohibited from assenting to conditions that will assure a fair and just requital for benefits received."

Enactment of House Bill 759 is a statutory acceptance for the State of Texas, freely and voluntarily made, of the statu-

Hon. Orville S. Carpenter, Page 25

tory offer of the United States, embodied in its Social Security
Act and Railroad Unemployment Insurance Act, to expend, for the
purposes collected, the four million dollars collected by Texas
for the relief of the unemployment problem arising within its
borders in connection with interstate common carriers by rail.
The grant or appropriation of this four million dollars by the
Legislature of Texas, upon these conditions and for these pur-
poses is clearly a public or governmental purpose for which grants
or appropriations of public moneys may be made, under the author-
ity of the cases of City of Aransas et al vs. Keeling, 247 S. W.
818; Bexar Co. vs. Linden, 220 S. W. 761; Road District No. 4,
Shelby Co. vs. Allred, 68 S. W. (2d) 164. In the instant case
we have no grant of money by way of gift or gratuity to a private
individual, firm or corporation condemned in the case of Texas
Pharmaceutical Association vs. Dooley, 90 S. W. (2d) 328.

The framers of the Texas Constitution probably did not en-
visage the complex inter-relations and cooperative efforts of Fed-
eral and State sovereignties under our latter-day economic and
industrial system, but their only purpose in writing into the or-
ganic law, these salutary restrictions against the waste or giving
away of public moneys, was to see to it that the only key that
should unlock the State Treasury was a public or governmental pur-
pose serving the public good. House Bill No. 759, Acts, Regular
Session, 46th Legislature, meets these requirements and we hold
same to be in all things constitutional.

Yours very truly

ATTORNEY GENERAL OF TEXAS

BY
Pat M. Neff, Jr.
Assistant

PMN:N

APPROVED FEB 1, 1940

Gerald C. Mann

ATTORNEY GENERAL OF TEXAS